## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**CRIMINAL ACTION**

**v.**

**NO. 21-25-JWD-RLB-1**

**JASON BROWN, ET AL.**

### RULING AND ORDER

This matter comes before the Court on the *Motion to Suppress* (Doc. 35) filed by Defendant Jason Brown ("Defendant"). The Government opposes the motion. (Doc. 37.) An evidentiary hearing was held on April 26, 2023, (Doc. 62), after which both parties submitted post-hearing briefs, (Docs. 65, 66, 67). Further argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is denied.

### I.    Background

####    A.  Overview

The instant motion centers on two main encounters between Defendant and law enforcement. The first occurred on November 2, 2018, the day Defendant was arrested. The second occurred on November 5, 2018, when Defendant was interviewed by telephone after being released on bail.

As a result of the information and evidence developed in these encounters, a federal grand jury returned an Indictment charging Defendant with the following offenses: on Count One, conspiracy to produce, use, and traffic in counterfeit access devices in violation of 18 U.S.C. § 371 and § 1029(a)(1); on Count Two, possession of fifteen or more counterfeit access devices in violation of 18 U.S.C. § 1029(a)(3); and on Count Three, illegal possession of device making

equipment in violation of 18 U.S.C. § 1029(a)(4). (Doc. 1 at 1–6.) Defendant's co-conspirator, Misty Campbell, is also charged in Counts One and Two of the Indictment. (*Id.* at 1–5.) Thereafter, Defendant moved to suppress the evidence seized the day of his arrest as well as statements he made on the day of his arrest and during his subsequent telephone interview. (*See* Doc. 35.)

At the April 26, 2023, hearing, East Baton Rouge Sheriff's Office ("EBRSO") Deputies David Hyer and Kyle Toups and EBRSO Detective Kevin Waguespack testified for the Government. Defendant did not present any witnesses. The relevant facts are largely taken from the testimony developed at the suppression hearing. Where exhibits are referenced, those exhibits were admitted into evidence at the hearing. (*See* Exhibits Log, Doc. 63.) Where the parties' briefs are cited for particular facts, the Court has reviewed the evidence—including the testimony from the hearing—and confirmed that that those facts are supported by evidence in the record.

As a general matter, the Court notes that the officers' testimony is uncontradicted. In any event, the Court listened to the testimony of the officers, observed their demeanor on the stand, and the Court found them highly credible.

### B. Relevant Facts

On November 2, 2018, EBRSO Deputy Hyer was dispatched to the Wyndham Garden Hotel located in Baton Rouge in response to a theft. (Hear. Tr., Doc. 64 at 6: 14–24; *see also* Gov. Ex. 1, EBRSO Incident Report by Hyer at 1.) More specifically, the complainant—a hotel security officer—reported that certain guests had paid for their room with a stolen credit card. (Doc. 37 at 2.) Hotel staff became aware of the theft after receiving a call from the true cardholder, who explained that he had the credit card with him in Illinois, but that it had been used without his or his wife's consent to rent the hotel room. (*Id.* at 2–3; Gov. Ex. 1, EBRSO Incident Report by Hyer at 28.) According to hotel employees, including hotel security, the potential suspects at that time

included two females whose vehicle was described as an SUV. (Hear. Tr., Doc. 64 at 7: 18–20.) Hotel security led Deputy Hyer to the suspects' room; Hyer testified that the room was completely empty, despite the fact that it had initially been rented over twelve hours earlier. (*Id.* at 7: 12–15.) Because the occupants were not in their room at that time, Deputy Hyer asked hotel staff to contact the EBRSO once the occupants returned. (*Id.* at 7: 20–22.)

Shortly thereafter, the hotel security officer phoned the EBRSO, advising officers that the suspects had returned and that he had detained one of the individuals, a female later identified as D.C. (Doc. 37 at 3.) When Deputy Hyer arrived back at the hotel, the security officer had D.C. "pinned up against the SUV that [the two suspects had] arrived in." (Hear. Tr., Doc. 64 at 8: 14–17.) The security officer told Deputy Hyer that D.C.'s "associate"—later identified as Misty Campbell—had struck him with a liquor bottle and fled on foot towards Interstate 10. (Doc. 37 at 3.)

Deputy Hyer took custody of D.C., advised her of her *Miranda* rights, and proceeded to interview her, during which time he noted the smell of marijuana. (*Id.*; *see also* Hear. Tr., Doc. 64 at 9: 15–19.) Deputy Hyer then "asked her if she had marijuana on her person." (Hear. Tr., Doc. 64 at 9: 19–20.) D.C. responded that she did not, "but she described in a particular location within the vehicle where she did have marijuana." (*Id.* at 9: 20–22.)

Without a warrant, Deputy Hyer entered the vehicle and retrieved the marijuana from one of the "door pocket[s]" where D.C. stated it was located. (*Id.* at 10: 6–8, 35: 12–13.) According to Deputy Hyer's testimony, while he was retrieving the marijuana, he "looked to [his] left" and "immediately saw a credit card skimming re-encoding device plainly right on the back floorboard of the vehicle." (*Id.* at 10: 11–13.) He removed the credit card skimming device and the marijuana from the vehicle. (*Id.* at 10: 22–23.) He also observed "dozens of credit cards that were strewed

about the floor, [ ] a laptop[,] and multiple department store bags." (*Id.* at 10: 17–19.)

Thereafter, Deputy Hyer continued questioning D.C., who told him that "she had traveled down with the other female and [her] boyfriend from the Chicago area." (*Id.* at 11: 8–11.) Based on this and other information Deputy Hyer learned—as discussed below—he testified that, in addition to the "financial crimes aspect" of the investigation, he grew suspicious the officers may be "dealing with prostitution at the minimum, but also potentially human trafficking." (*Id.* at 12: 4–12.)

### 1. Identification of Misty Campbell

While Deputy Hyer was investigating the theft at the hotel, another EBRSO deputy—Kyle Toups—was dispatched to assist with a car accident that had occurred near the hotel and Interstate 10. (Doc. 37 at 3.) At this time, Deputy Toups was notified that one of the female suspects involved in the theft at the hotel had fled by foot in the direction of Interstate 10. (*Id.* at 3–4; *see also* Hear. Tr., Doc. 64 at 15: 19–21.) Deputy Toups asked those on the accident scene whether they had seen a female fitting the suspect's description, and "one of the drivers from the crash" responded "yes, . . . she's inside my vehicle." (Hear. Tr., Doc. 64 at 51: 19–20, 52: 5–8.) Deputy Toups then asked the driver "if he could open the vehicle so [Deputy Toups] could check and [the driver] agreed to." (*Id.* at 52: 21–22.) When the driver opened his vehicle, Deputy Toups found Misty Campbell "crouched down inside the vehicle." (*Id.* at 52: 21–25.)

Campbell was then detained and taken back to the hotel by another deputy for questioning. (Doc. 37 at 4; *see also* Gov. Ex. 4, EBRSO Incident Report by Toups at 3.) At the hotel, the security officer identified Campbell as the woman he had seen in the SUV who had battered him with a liquor bottle. (Doc. 37 at 4.) Once Campbell arrived at the hotel, Deputy Hyer advised her of her *Miranda* rights and began questioning her; Campbell provided false information about her name

and date of birth and "refused to cooperate with the investigation." (Hear. Tr., Doc. 64 at 16: 15–23.)

Subsequently, Campbell was placed under arrest for resisting an officer and searched. (Gov. Ex. 1, EBRSO Incident Report by Hyer at 29.) During the search of Campbell's person, Deputy Hyer found a fraudulent driver's license "and more than a dozen credit cards (most of which did not have her name on them), which were later determined to be loaded with different data than [that] displayed on the card[s]." (*Id.*) "Based on the nature of the crimes being investigated," EBRSO Detectives Perry Frith and Kevin Waguespack with the Financial Crimes Division were notified and dispatched to the scene. (*Id.*)

### 2. Defendant Meets Deputy Toups

Deputy Toups remained at the scene of the car accident near Interstate 10 after Campbell was taken back to the hotel by another deputy. (*See* Hear. Tr., Doc. 64 at 53: 8–16.) At some point thereafter, a man later identified as Defendant Jason Brown, "approached the scene and . . . seemed really interested in the crash[.]" (*Id.* at 53: 17–21.) Defendant told Deputy Toups that the driver involved in the crash whom Toups had previously spoken to was his relative; Defendant and Deputy Toups engaged in "small talk" and Defendant told Toups he was "having a bad night" because his girlfriend (later identified as D.C.) had just been arrested for renting their hotel room with a stolen credit card. (*Id.* at 53: 21–25, 54: 1–4.)

Defendant concluded his conversation with Deputy Toups and began walking toward the hotel, at which time Deputy Toups notified the officers investigating the theft at the hotel that he suspected Defendant was involved in the theft based on the information he had just received. (*Id.* at 54: 7–11.)

### 3. Search and Detention of Defendant

At this point, Deputy Hyer—still at the hotel—had just received "radio traffic from Deputy Toups" regarding his suspicions about the male walking back toward the hotel when he saw Defendant "walking . . . past the squad cars and down the sidewalk." (*Id.* at 17: 7–9, 13–14.) Deputy Hyer then spoke to Defendant, stating "something to the effect of, *hey buddy, would you come talk to me? I think I have your girlfriend detained*." (*Id.* at 17: 17–18 (emphasis in original).) Defendant walked over to Deputy Hyer, and the first thing Hyer asked him was if he could have Defendant's name and date of birth. (*Id.* at 18: 22–23.) Defendant provided Deputy Hyer "with his name and date of birth" but told him that "he didn't have an ID[.]" (*Id.* at 19: 2–4.)

Deputy Hyer testified that he then asked Defendant if he could conduct a "pat down" of "the exterior of his clothing" and that Defendant consented; Hyer did not locate any weapons. (*Id.* at 19: 7–9.) Defendant was wearing a bag at the time, so Deputy Hyer asked for Defendant's permission "to look in the bag to make sure there was no weapon in there." (*Id.* at 19: 11–14.) Defendant consented, (*id.* at 19: 16), and upon looking in the bag, Deputy Hyer observed a Florida identification card that he "could immediately tell . . . was fraudulent[,]" (*id.* at 19: 21–22, 20: 14–15; *see also id.* at 20: 17–25 (providing reasoning for why he immediately believed the ID was fraudulent)).

Deputy Hyer told Defendant that the name on the identification card did not match the name Defendant had provided, to which Defendant responded: "oh, it's for Halloween." (*Id.* at 21: 2–4.) Deputy Hyer "immediately detained [Defendant] in handcuffs and placed him under arrest for possession of fraudulent identification." (*Id.* at 21: 4–6.) Deputy Hyer testified that he did not ask Defendant any further questions until after he had read him his *Miranda* rights in the back of the patrol car Defendant was placed in. (*Id.* at 21: 8–13.)

### 4. Detective Waguespack Speaks to Defendant

Shortly after Defendant was detained, Detectives Frith and Waguespack arrived at the hotel. (Gov. Ex. 1, EBRSO Incident Report by Hyer at 29.) Detective Waguespack testified that he was the supervisor on this investigation and that Detective Frith was the lead on the case. (Hear. Tr., Doc. 64 at 60: 6–24.) A card reader was used to test the credit cards found on Campbell's person and in Defendant's bag, and the testing confirmed that the cards were fraudulent. (Gov. Ex. 1, EBRSO Incident Report by Hyer at 29.) In the meantime, Detective Waguespack briefly spoke with Defendant, who was detained in the back of a police unit. (Doc. 37 at 5.)

According to Detective Waguespack's testimony, he did not—as Defendant claims—threaten Defendant with federal prosecution in the event Defendant failed to cooperate, but rather explained to him how,

> [t]ypically on these cases, if we can wrap them up kind of in a timely manner using our own resources [that is, state, not federal, resources], they typically go to state court. But if we have to call in the secret service to help track down the credit card account holders and things of that nature, many times they like to make it federal because they participate in the investigation.

(Hear. Tr., Doc. 64 at 61: 16–25, 62: 1.)

As a result of this investigation, Defendant, Campbell, and D.C. were formally arrested on various state charges. (*See* Gov. Ex. 1, EBRSO Incident Report by Hyer at 29–30.) As stated above, only Defendant and Campbell are charged in this case. (*See* Doc. 1.)

### 5. Post-Bail Interview of Defendant

On November 5, 2018, three days after the arrests, Detective Frith and "Special Agent Kirby" contacted Defendant by telephone to conduct an interview. (Hear. Tr., Doc. 64 at 64: 13–17 (Waguespack testifying that he knew Detective Frith "with Special Agent Kirby" spoke to Defendant on November 5, but was unaware if it was a phone interview or not).)

At the hearing, very little was said about this post-bail interview of Defendant, as it was

only raised during examination of Detective Waguespack. (*See* Hear. Tr., Doc. 64 at 60, 63–65.) And, as noted above, neither Frith nor Kirby testified at the hearing.[1]

## II.     Overview of the Instant Motion[2]

To support his motion, Defendant advances four main arguments: (1) Deputy Hyer lacked legal authority to conduct a warrantless search of the vehicle, where he found marijuana and a fraudulent credit card skimming device, (Doc. 65 at 1–3); (2) Defendant's statements to Deputy Hyer before he was handcuffed should be suppressed because Hyer failed to *Mirandize* Defendant first, (*id.* at 4–5); (3) Defendant did not validly consent to a search of his person or bag, (*id.* at 6–7); and (4) Defendant's post-bail statements to "Detective Frith and Special Agent Kirby should be suppressed" because Detective Waguespack made a promise to keep Defendant out of federal court if he cooperated and he breached that promise, thus rendering Defendant's confession involuntary, (*id.* at 5).

## III.    Discussion: Fourth Amendment

### A.  Standard

"The Fourth Amendment guarantees that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' " *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions

---

[1] The Government provides some details about this interview in its pre-hearing memorandum, (*see* Doc. 37 at 6), but the Court is unable to locate any specifics about this interview from the evidence in the record. As shown in Defendant's post-hearing memorandum, he does not take issue with the specific procedures of the interview conducted on November 5, 2018, but rather argues that his statements from this interview should be suppressed because they were given in reliance on the purported promise made by Detective Waguespack three days earlier that if he cooperated, he would not be federally prosecuted. (*See* Doc. 65 at 5.)

[2] Because Defendant presents some arguments in his post-hearing memorandum that were not included in his pre-hearing memorandum, only the former is cited here.

of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 653–654 (1979)). Accordingly, "[t]he Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971)).

"A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)). "However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *Id.* (citing *United States v. Castro*, 166 F.3d 728, 733 n.7 (5th Cir. 1999)).

### B. Parties' Arguments

#### 1. Defendant

Defendant seeks to suppress two categories of evidence on Fourth Amendment grounds. First, though not addressed in his original motion, Defendant contends in his post-hearing memorandum that the evidence seized from the vehicle must be suppressed because Deputy Hyer violated the Fourth Amendment by searching that vehicle. (*See* Doc. 65 at 1–3.) To support this contention, Defendant argues that the search of the rental vehicle was conducted without a warrant and none of the exceptions to the warrant requirement apply here. (*Id.* at 1.) Though Defendant acknowledges that D.C. gave Hyer consent to enter the vehicle to retrieve the marijuana, he avers that such consent was invalid because Deputy Hyer was aware the vehicle was a rental but unaware of "who rented the car and [thus who] could provide him with the authority for a consensual search." (*Id.* (citing Hear. Tr., Doc. 64 at 34: 13–20); *see also id.* at 3 (arguing that "no evidence

9

[was] submitted at the hearing which would provide the identity of the authorized users of the car who could provide consent to search.").)

Next, Defendant takes issue with the pat-down of his person and the search of his bag, both of which were conducted by Deputy Hyer. (*Id.* at 6–7.) As to the search of his bag, Defendant argues that his consent to this search "was vitiated by the constitutional violations inflicted upon him by Deputy Hyer"—namely, Hyer's "questioning him without advising him of his *Miranda* warnings." (*Id.* at 6.) Defendant's arguments concerning this purported Fifth Amendment violation will be addressed further below. In addition, Defendant maintains that "Deputy Hyer administered an unconstitutional pat-down" of his person because "[a] pat-down is only justified when the police have reasonable suspicion to believe a person they have encountered is armed[,]" and neither Defendant's actions nor his appearance gave "any reason to suggest he was armed." (*Id.*) Moreover, Defendant states, although the frisk would be constitutional without reasonable suspicion if valid consent was given, his consent to the pat-down in this case was not voluntary. (*Id.* at 6–7.) Defendant acknowledges that no contraband was recovered from the frisk but points out that the fraudulent Florida ID was recovered from the search of his bag and thus asks the Court to exclude this evidence from the Government's case in chief. (*Id.* at 6.)

### 2. The Government

As to the Fourth Amendment issues implicated here, the Government's argument is three-fold. First, the Government avers that Defendant's initial encounter with Deputy Hyer was a consensual, voluntary encounter and thus did not trigger the Fourth Amendment. (Doc. 66 at 1–3; Doc. 37 at 6–7.) Second, the Government argues that even if Defendant was detained during this initial encounter, it was still a constitutionally valid investigatory stop under the two-part framework established in *Terry v. Ohio*, 392 U.S. 1, 22 (1968). (Doc. 37 at 7–8; Doc. 66 at 3–8.)

10

Third, as to the search of Defendant's bag, the Government argues that this search was constitutionally valid because Defendant voluntarily consented to it. (Doc. 66 at 3.)

More specifically, on the second argument raised above, the Government maintains that the first *Terry* prong is satisfied because Deputy Hyer had an objectively reasonable suspicion that Defendant was involved in criminal activity—particularly the theft at the hotel—based on the facts within his knowledge as described above. (*See* Doc. 66 at 3–6; *see also id.* (where the Government summarizes Hyer's testimony about why he suspected human trafficking based on his training and the circumstances at hand).) As to the second *Terry* prong, which requires the scope of the detention to be carefully tailored to its underlying justification, the Government states in its pre-hearing opposition that the entire encounter between Defendant and Deputy Hyer "lasted no more than a few minutes." (Doc. 37 at 9.) Thus, according to the Government, the stop was reasonable in scope and duration up until the point Hyer discovered the fraudulent ID in Defendant's bag. (*Id.*) In its post-hearing memorandum, the Government additionally argues that the second *Terry* prong is met because (a) Hyer's pat-down and search for weapons was reasonably related in scope to his suspicions about the theft investigation and human trafficking, and (b) this encounter was consensual, as shown by Hyer's testimony. (Doc. 66 at 7.)

The Court notes that Defendant raised his argument concerning the unconstitutional search of the rental vehicle for the first time in his post-hearing memorandum, and the Government has not responded to it.

### C.  First Issue: Warrantless Search of the Vehicle

#### 1. Applicable Law and Analysis

It is undisputed that Deputy Hyer did not have a warrant for the search. (Hear. Tr., Doc. 64 at 35: 12–13.) As explained above, Defendant asks the Court to suppress the marijuana and credit

card skimming device seized from the vehicle because he argues that Deputy Hyer's search of that vehicle violated the Fourth Amendment. (*See* Doc. 65 at 1–3.) According to Defendant, none of the exceptions to the warrant requirement are applicable here. (*Id.* at 1.) Though Defendant acknowledges that D.C. gave Deputy Hyer consent to enter the vehicle to retrieve the marijuana, he avers that such consent was invalid because Deputy Hyer was aware the vehicle was a rental but unaware "of who rented the car and [thus who] could provide him with the authority for a consensual search." (*Id.* (citing Hear. Tr., Doc. 64 at 34: 13–20); *see also id.* at 3 (arguing that "no evidence [was] submitted at the hearing which would provide the identity of the authorized users of the car who could provide consent to search").) The Court need not resolve this issue because Deputy Hyer's search of the vehicle was clearly valid under the automobile exception to the warrant requirement.

"The automobile exception allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband." *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)). "Probable cause is determined by examining the totality of the circumstances." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)). The uncontradicted testimony at the hearing shows that, once Deputy Hyer began questioning D.C., he noted the smell of marijuana. (Ev. Hear. Tr., Doc. 64 at 9: 18–19.) He then asked D.C. if she had marijuana on her person, to which she responded "no" but that there was marijuana in the vehicle. (*Id.* at 9: 20–22.) D.C. then "described in a particular location within the vehicle where she did have marijuana." (*Id.*) Subsequently, Deputy Hyer entered the vehicle and searched the location that D.C. described to retrieve the marijuana. (*Id.* at 9: 24–25, 10: 1.) Though Deputy Hyer did not have a warrant to search the vehicle, he had probable cause to believe it contained contraband—here, marijuana—based on his noting the smell of marijuana and D.C.'s

statements that the vehicle contained marijuana. *See, e.g.*, *United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015) (upholding the district court's decision to not suppress the rifles seized from the defendant's vehicle because his "oral statements" that "he had bought the rifles for someone else" gave the officers probable cause to search).

The fact that "marijuana is no longer a strictly prohibited substance," as Defendant points out, (Doc. 65 at 2), does not alter this conclusion. By stating that "marijuana is no longer a strictly prohibited substance," (*id.*), Defendant appears to be arguing that Deputy Hyer lacked probable cause to search the car based on the smell of (and D.C.'s statement about) the marijuana because *if* an individual possesses marijuana pursuant to a medical prescription, the marijuana is not illegal contraband. (*See* Hear. Tr., Doc. 64 at 34: 21–24 (where defense counsel asked Deputy Hyer if, after noting the smell of marijuana, Deputy Hyer "asked [D.C.] if she had any prescription for marijuana[,]" to which Hyer responded that he "did not.").) If this is a correct interpretation of Defendant's argument, the Court rejects it. "There is established law that smelling marijuana provides sufficient probable cause to conduct a warrantless search." *Ellis v. Garza-Lopez*, No. 23-10022, 2023 WL 3723634, at *2 (5th Cir. May 30, 2023) (citing *Bazan v. Whitfield*, 754 F. App'x 280, 281 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 125 (2019) (citation omitted)) (finding the officers "had probable cause to suspect [Ellis] of a crime and therefore search his vehicle. . . . [because they] each could smell marijuana emanating from the open car windows").

No argument has been made that a valid medical prescription existed for the marijuana seized in this case, nor has Defendant cited any authority imposing a duty on police officers to ask about a medical prescription in order to confirm the illicit nature of that marijuana before seizing it. D.C.'s statement to Deputy Hyer, combined with his smelling marijuana on her person, gave him probable cause to believe the vehicle contained illegal contraband. As a result, the search was

permissible. Because the search was constitutional, all the evidence Deputy Hyer seized—including the credit card skimming device on the back floorboard of the vehicle, which he immediately recognized as fraudulent—was seized lawfully. (*See* Hear. Tr., Doc. 64 at 10: 11–13, 16–18.) For these reasons, the Court will deny the motion with respect to the evidence seized from the vehicle.

### D.  Second Issue: *Terry* Stop

#### 1. Applicable Law

"The Fourth Amendment allows for brief investigative stops where an officer 'has reasonable, articulable suspicion that [a] person has been, is, or is about to be engaged in criminal activity.' " *United States v. Smith*, No. 18-51, 2019 WL 126733, at *3 (M.D. La. Jan. 8, 2019) (deGravelles, J.) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985) (emphasis and internal quotation marks omitted)). "Moreover, protective frisks and pat-downs for weapons are authorized for officer safety during a stop where . . . officers have reason to believe that a suspect is armed." *Id.* (first citing *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010) ("In order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry."); then citing *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)).

In determining whether a *Terry* stop is constitutionally permissible, "[t]he Court must analyze whether the officer's actions were initially justified, and whether 'there [was] a reasonable relation between subsequent actions and the circumstances that supported the stop.' " *Id.* (quoting *United States v. Vickers*, 540 F.3d 356, 360 (5th Cir. 2008)). As to the first prong under *Terry*, this Court has explained:

> Critically, though an officer's "mere hunch" is insufficient, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and

obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citations and internal quotation marks omitted). Whether reasonable suspicion to stop exists is determined by "the facts known to the officer at the time." *Vickers*, 540 F.3d at 361. It is also "dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). The ultimate question is whether the "facts available to the officer ... [would] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

*Id.*

"When, as here, the officers conducting the stop act without a warrant, the Government bears the burden of proving reasonable suspicion." *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010) (citation omitted).

## 2. Analysis

In sum, the Court need not determine whether Defendant's consensual encounter with Deputy Hyer ripened into a seizure, because even if it did, Deputy Hyer's stop was permissible under *Terry*.

First, in determining whether Deputy Hyer had "reasonable, articulable suspicion that" was or had been engaged in some sort of criminal activity, the Court must look at "the facts known to [Deputy Hyer] at the time" of the stop. *Vickers*, 540 F.3d at 361 (citation omitted). The testimony of both Deputy Hyer and Deputy Toups establishes that Deputy Hyer had ample reason, grounded in articulable facts, to believe Defendant was involved in criminal activity at the time he approached him for questioning. Prior to speaking with Defendant in the hotel parking lot, Deputy Hyer had already: (1) detained D.C. and Campbell for the theft at the hotel, (Ev. Hear. Tr., Doc. 64 at 8: 19, 16: 15–17); (2) learned D.C. had traveled from Chicago with her "boyfriend" and Campbell, (*id.* at 11: 8–12); (3) confiscated marijuana and a credit card skimming device from the

rental vehicle that the three were traveling in, (*id.* at 15: 2–4); (4) observed dozens of credit cards in the vehicle, (*id.* at 15: 5–7); and (5) been advised by Deputy Toups that Toups suspected the male walking down the sidewalk toward the hotel was involved in the theft under investigation and that he believed Hyer had that man's girlfriend detained, (*id.* at 54: 6–11, 17: 7–10).

In addition, Deputy Hyer testified that, based on his training, experience, and the facts before him, he suspected that the individuals may also be involved in human trafficking or prostitution. (*Id.* at 12: 8–12, 14: 1–9.) More specifically, he developed this suspicion based on, *inter alia*: (1) his "mandated [EBRSO] trainings concern[ing] human trafficking," (*id.* at 13: 22–24); (2) "the fact that they had the [hotel] room for over [twelve] hours, and there were no items of any kind in the hotel room, . . . [with] multiple females that looked like they were traveling in a car they were living in, on the same weekend as a major LSU football game," (*id.* at 12: 4–8); and (3) his impression that D.C. was "being groomed or something" because she stated that she had just met her "boyfriend" online a few weeks prior, she traveled such a far distance with him, and when asked about the shopping bags, she claimed he "buys her things," (*id.* at 14: 1–9). Accordingly, the Court concludes that—based on this information—Deputy Hyer had the requisite reasonable suspicion that Defendant was involved in the financial crime under investigation at the hotel and possibly even prostitution or human trafficking.

The second *Terry* prong requires "a reasonable relation between subsequent actions and the circumstances that supported the stop." *Smith*, 2019 WL 126733, at *3 (quoting *Vickers*, 540 F.3d at 360). The Government has likewise satisfied this requirement. Based on Deputy Hyer's detailing of the interaction between him and Defendant, the entire encounter included a minimum of two or three questions, a brief pat-down, and a search of the bag, after which Defendant was arrested. Hence, the encounter between the two likely lasted a matter of a few minutes.

16

Moreover, Deputy Hyer's frisk or pat-down of Defendant was justified because the facts show that an officer in Deputy Hyer's position would have reason to believe Defendant might be armed. *See Vickers*, 540 F.3d at 362 (5th Cir. 2008) (citation omitted) ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). Again, Deputy Hyer testified that he suspected possible involvement in prostitution or human trafficking and that he had this belief in mind as Defendant approached him. (Hear. Tr., Doc. 64 at 18: 15–20 (". . . in my mind, again, this is going towards the realm of human trafficking. . . . I know that coercion can be obtained through physical, mental, and emotional abuse and threats, so I'm concerned there may be a weapon involved."); *see also id.* at 19: 11–14 ("again . . . being concerned with potential weapon involvement, I asked him if he would permit me to look in the bag to make sure there was no weapon there.").) In addition, Defendant's co-conspirator, Campbell, had previously battered a hotel security officer with a liquor bottle before fleeing the hotel. (*Id.* at 8: 24–25, 9: 1–4.) Considering all of these factors about which Deputy Hyer was aware, it was reasonable for him to believe Defendant could be armed. Thus, the Court finds that Deputy Hyer was justified in taking "reasonable steps to protect himself during the detention." *United States v. Spencer*, 575 F. App'x 274, 276 (5th Cir. 2014).

Additionally, Hyer asked for permission to search Defendant's bag based on the belief that Defendant was involved in the theft under investigation after officers had already (a) discovered incriminating evidence in relation to the theft by searching Campbell's person and the rental vehicle, and (b) arrested D.C. in relation to the theft Defendant was suspected of being involved in. Accordingly, the Court concludes that Deputy Hyer had reasonable suspicion of criminal activity and acted objectively reasonably in briefly detaining and patting down Defendant.

### E.  Third Issue: Warrantless Search of Defendant's Bag

#### 1. Applicable Law

"A search conducted pursuant to consent serves as one of the few specifically established and well-defined exceptions to the warrant requirement." *United States v. Lara*, No. 14-124, 2015 WL 4193138, at *6 (M.D. La. July 10, 2015) (deGravelles, J.) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)), aff'd sub nom. *United States v. Rodriguez-Lara*, 678 F. App'x 232 (5th Cir. 2017). "Importantly, '[c]onsent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation.' " *Id.* (quoting *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006) (citation omitted)). "However, '[t]o be valid, consent to search must be free and voluntary.' " *Id.* (quoting *United States v. Olivier–Becerril*, 861 F.2d 424, 425 (5th Cir. 1988) (citations omitted)). The government is entitled to use the consent exception if it shows, by a preponderance of the evidence, that: (1) "the consent was given voluntarily[;]" and (2) "either the defendant himself consented to the search or that consent was obtained from a third party that had the ability to furnish valid consent." *Id.* (quoting *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995)).

With respect to the first prong, the voluntariness of consent is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227.

> In evaluating the voluntariness of consent, courts have traditionally considered six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Morales*, 171 F.3d 978, 982–983 (5th Cir. 1999); *Olivier–Becerril*, 861 F.2d at 426 (citations omitted). All six factors are relevant, but no single one is dispositive or controlling. *Id.*

*Lara*, 2015 WL 4193138, at *6.

#### 2. Analysis

18

Here, it is undisputed that Defendant gave Deputy Hyer consent to search his bag. (Doc. 65 at 6; *see also* Ev. Hear. Tr., Doc. 64 at 13–16.) At issue is the second prong delineated above— that is, whether his consent was voluntarily given. (*See* Doc. 65 at 6.)

The first factor—"the voluntariness of the defendant's custodial status"—weighs in favor of the Government because, as explained below, Defendant was not in custody at the time Deputy Hyer requested to search his bag. *Morales*, 171 F.3d at 982. The second and third factors also tip in favor of finding that Defendant's consent was voluntary. The testimony at the hearing indicates that the police procedures employed by Deputy Hyer were not coercive; on the contrary, Hyer's testimony shows that he wanted to—and did—initiate a wholly consensual encounter with Defendant, notwithstanding the fact that Hyer believed he had reasonable suspicion to detain Defendant. (Ev. Hear. Tr., Doc. 64 at 17: 20–21, 18: 10–12, 44: 14–17; *see id.* at 37: 10–17 (Hyer answering that while he himself did not believe Defendant was free to leave, Hyer "gave no indication to [Defendant] that he wasn't free to leave.").)

The fourth and fifth factors are neutral, and the sixth factor—"the defendant's belief that no incriminating evidence will be found"—weighs in favor of Defendant, since he presumably knew the fraudulent Florida ID was in his bag before giving Deputy Hyer consent to search it. *Morales*, 171 F.3d at 983. On balance, the totality of the circumstances indicate that Defendant's consent was given voluntarily. Therefore, the Court finds that Deputy Hyer's search of Defendant's bag was constitutionally permissible. As such, with respect to the evidence of Defendant's fraudulent Florida ID seized from his bag, the motion is denied.

## IV.    Discussion: Fifth Amendment and *Miranda*

### A.  Standard

The Fifth Amendment provides in relevant part that "[n]o person . . . shall be compelled in

any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*,

the Supreme Court concisely laid out its holding with respect to the Fifth Amendment as follows:

> [T]he prosecution may not use statements, whether exculpatory or
> inculpatory, stemming from custodial interrogation of the defendant
> *unless* it demonstrates the *use of procedural safeguards* effective to
> secure the privilege against self-incrimination. By *custodial
> interrogation*, we mean questioning initiated by law enforcement
> officers after a person has been taken into custody or otherwise
> deprived of his freedom of action in any significant way. As for the
> procedural safeguards to be employed, unless other fully effective
> means are devised to inform accused persons of their right of silence
> and to assure a continuous opportunity to exercise it, the following
> measures are required. Prior to any questioning, the person must be
> warned that he has a right to remain silent, that any statement he
> does make may be used as evidence against him, and that he has a
> right to the presence of an attorney, either retained or appointed. The
> defendant *may waive* effectuation of these rights, provided the
> waiver is made *voluntarily, knowingly and intelligently*. If, however,
> he indicates in any manner and at any stage of the process that he
> wishes to consult with an attorney before speaking there can be no
> questioning. Likewise, if the individual is alone and indicates in any
> manner that he does not wish to be interrogated, the police may not
> question him. The mere fact that he may have answered some
> questions or volunteered some statements on his own does not
> deprive him of the right to refrain from answering any further
> inquiries until he has consulted with an attorney and thereafter
> consents to be questioned.

*Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966) (emphasis added).

"The Government has the burden of proving a waiver of the Defendant's *Miranda* rights

by a preponderance of the evidence." *United States v. Williams*, No. 19-117, 2020 WL 2573240,

at *6 (M.D. La. May 21, 2020) (deGravelles, J.) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–

69 (1986)).

### B.  Parties' Arguments

#### 1. Defendant

Defendant seeks to suppress statements he made during two encounters. The first involves the statements he made to Deputy Hyer on November 2, 2018, before he was handcuffed and placed in Hyer's patrol unit. The second involves his post-bail interview by telephone on November 5, 2018.

As to the first incident, Defendant argues that his initial encounter with Deputy Hyer—spanning from their first contact to the moment he was handcuffed—amounted to a custodial interrogation, and thus *Miranda* applied. (*Id.* at 4–5.) Because Defendant was not *Mirandized* until after he was placed in handcuffs, he contends that any statements he made to Deputy Hyer before that point must be suppressed. (*Id.* at 4.) Defendant focuses on the "in custody" inquiry here, arguing that based on the circumstances he was aware of at the time he first encountered Deputy Hyer, a reasonable inference can be drawn that he "believed he was in custody and not free to leave." (*Id.* at 4–5.) To further support his contention that he was in custody, Defendant points out that, at the hearing, Deputy Hyer testified that Defendant was in fact not free to leave. (*Id.* at 4.) For these reasons, Defendant asks that his statement to Deputy Hyer that "he lacked any identification" prior to Hyer finding the fraudulent Florida ID be suppressed.[3] (*Id.* at 5.)

Next, Defendant contends that his statements to Detective Frith and Special Agent Kirby on November 5, 2018, were not freely and voluntarily given. (*Id.*) Defendant does not argue that Frith and Kirby failed to *Mirandize* him prior to this interview, nor does he focus on the procedures used during that questioning. Rather, his argument on this point centers on the purported promise Detective Waguespack made to him on the day of his arrest:

> When Mr. Brown was cuffed and inside of Deputy Hyer's police unit he will be approached by EBRSO Financial Crimes Detective Waguespack who gave Brown the option of cooperating and having

---

[3] Clearly, should Defendant prevail on this part of his motion, his statement that the fraudulent Florida ID was "for Halloween" would also be excluded, (Hear. Tr., Doc. 64 at 21: 3–4), though Defendant does not mention that statement in his briefs.

the charges remain "state" or not cooperate and have them become federal charges. Brown advised that he would cooperate and after he was released from jail gave an interview. While the contents of that interview were not admitted into evidence, it was established that he did speak to law enforcement. Certain promises, if not kept, are so attractive that they render a resulting confession involuntary. *Streetman v. Lynaugh*, 812 F.2d[ ] 950 (5[th] Cir. 1987). We know Brown was given a promise to keep things out of federal court- a promise that was obviously breached notwithstanding that the adult co-defendant was able to resolve her case in state court. A confession is not freely and voluntarily given if made pursuant to promises of this magnitude from law enforcement. As such, whatever Mr. Brown advised Detective Frith and Special Agent Kirby should be suppressed and excluded from evidence in the Government's case in chief.

(*Id.* (citation to the hearing transcript omitted).)

### 2. The Government

The Government's post-hearing memorandum, which was filed the same day as Defendant's post-hearing memorandum, does not address Defendant's argument that he was in custody and thus should have been given *Miranda* warnings before he was handcuffed, nor does it mention statements made during the post-bail interview on November 5, 2018. Instead, the Government focuses on the statements Defendant made while he was handcuffed and detained in the back of Deputy Hyer's patrol unit. (*See* Doc. 66 at 8.) However, the Government does address the purported "promise" made by Detective Waguespack, which in substance practically addresses Defendant's arguments concerning his post-bail interview statements.

According to the Government, on the night of Defendant's arrest, he made custodial statements while being questioned in the patrol unit pursuant to a knowing and voluntary waiver of his *Miranda* rights. (Doc. 66 at 8; *see also* Doc. 37 at 9.) The Government points to the testimony from the hearing and the video evidence from Deputy Hyer's fleet camera as showing that Defendant, after being *Mirandized*, "continued to engage Hyer in conversation[,]" thereby waiving

22

his rights. (Doc. 66 at 8 (citations omitted).) As to the "promise" Defendant claims Detective

Waguespack made to him, the Government states:

> The defendant claims that he refused to make a statement until he
> was informed by detectives that failure to do so would result in his
> being prosecuted in federal court, thus rendering his confession
> involuntary.
> . . .
> The conversation was brief and polite; no threats or promises were
> made. Merely encouraging cooperation with the government and
> informing a defendant of realistic penalties associated with his
> cooperation or non-cooperation does not render any statement
> involuntary. *United States v. Davis*, 912 F. Supp. 245, 248 (5th Cir.
> 1995). What renders a confession involuntary is not any threat or
> promise, but rather a threat or promise of *illegitimate* action. *Id.*; *See
> also United States v. Kolodziei*, 706 F.2d 590, 594 (5th Cir. 1983)
> (emphasis added).

(*Id.*)

### C. Analysis

#### 1. Defendant's Non-*Mirandized* Statements to Deputy Hyer

The question of whether Defendant's statements to Deputy Hyer before he was advised of

his *Miranda* rights should be suppressed turns on whether Defendant was "in custody" at that time.

"*Miranda* warnings are necessary during a custodial interrogation for a suspect's statements to

later be admissible in compliance with the Fifth Amendment." *United States v. Shows Urquidi*, 71

F.4th 357, 370 (5th Cir. 2023) (citing *United States v. Coulter*, 41 F.4th 451, 456 (5th Cir. 2022)).

"A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a

reasonable person in the suspect's position would have understood the situation to constitute a

restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.*

(quoting *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015) (quoting *United States v.

Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988))).

"Put more succinctly: 'would a reasonable person have felt he or she was not at liberty to

terminate the interrogation and leave.' " *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "[W]hether a suspect is in custody is an objective inquiry that depends on the totality of the circumstances." *Id.* (cleaned up). Elaborating on this issue, the Fifth Circuit has explained:

> Although no one fact is determinative, we have repeatedly considered certain key details when analyzing whether an individual was or was not in custody, including the length of the questioning; the location of the questioning; the accusatory, or non-accusatory, nature of the questioning; the amount of restraint on the individual's physical movement; and statements made by officers regarding the individual's freedom to move or leave.

*Shows Urquidi*, 71 F.4th at 370 (internal quotation marks omitted) (quoting *Wright*, 777 F.3d at 775).

In this case, the totality of the circumstances show that Defendant was not in custody for *Miranda* purposes at any time prior to being handcuffed. Based on Deputy Hyer's testimony, his entire interaction with Defendant up to the point Defendant was placed in handcuffs can be summarized as follows: Deputy Hyer asked Defendant for his name and date of birth, (Hear. Tr., Doc. 64 at 18: 22–23), to which Defendant responded that he did not have an ID on him, but provided his name and date of birth, (*id.* at 19: 2–4); Hyer asked Defendant if he could pat-down the exterior of his clothing, Defendant consented, and Hyer found no weapons, (*id.* at 19: 7–9); Hyer then asked Defendant if he could look in his bag, and Defendant consented, (*id.* at 19: 11–16); Hyer observed an ID in the bag, (*id.* at 19: 21–24); Hyer noticed that the name on the ID did not match the name Defendant had previously provided, so Hyer asked him about this, and Defendant stated the ID was for Halloween, (*id.* at 21: 1–7); Hyer immediately detained Defendant in handcuffs and placed him in his patrol unit, (*id.* at 21: 4–9); Hyer did not ask Defendant another question until after advising him of his *Miranda* rights, (*id.* at 21: 7–9, 23: 13–21, 24: 4–6).

Based on Deputy Hyer's detailing of the interaction, the entire encounter included a

minimum of two or three questions, a brief pat-down, and a search of the bag, after which Defendant was arrested. Hence, the encounter likely lasted a few minutes. Moreover, the questioning itself was both brief and non-accusatory, and it took place in a public location—the hotel parking lot. Defendant makes much ado over Deputy Hyer's testimony that he believed Defendant was in fact not free to leave. (*See* Doc. 65 at 4.) However, whether a suspect is in custody is an "objective inquiry," *Shows Urquidi*, 71 F.4th at 370 (cleaned up), and Hyer also testified that he "gave no indication to [Defendant] that he wasn't free to leave[,]" (Hear. Tr., Doc. 64 at 37: 16–17). *See also Wright*, 777 F.3d at 775 (citations omitted) ("[T]he 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant.").

Therefore, the Court finds that Defendant was not in custody at any point before he was handcuffed by Deputy Hyer, and thus Hyer was not required to advise Defendant of his *Miranda* rights before questioning him at that time. As a result, the Court will deny Defendant's motion to suppress the statements he made before being placed in handcuffs.

### 2. Voluntariness of Defendant's Post-Bail Confession based on Detective Waguespack's Purported Promise

"For a petitioner to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and it is essential that there be a link between the coercive conduct of the police and the confession of the petitioner." *Bethely v. Vannoy*, No. 19-463, 2021 WL 6535945, at *4 (M.D. La. Nov. 4, 2021) (citing *Colorado v. Connelly*, 479 U.S. 157, 163–65 (1986)), *report and recommendation adopted*, No. 19-463, 2022 WL 164538 (M.D. La. Jan. 18, 2022), *vacated* (Jan. 20, 2022), and *report and recommendation adopted*, No. 19-463, 2022 WL 988367 (M.D. La. Mar. 31, 2022), certificate of appealability denied sub nom. *Bethely v. Hooper*, No. 22-30259, 2022 WL 16572037 (5th Cir. Sept. 30, 2022). "Any evidence that the accused was threatened, tricked, or cajoled into a waiver will show that the petitioner did not voluntarily waive

his privilege." *Id.* (citing *Miranda*, 384 U.S. at 476). However, "[t]rickery or deceit is only prohibited to the extent that it deprives the petitioner of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* (citing *Soffar v. Cockrell*, 300 F.3d. 588, 596 (5th Cir. 2002)).

"The standard for determining whether a confession is voluntary is whether, taking into consideration the 'totality of the circumstances,' the statement is the product of the accused's 'free and rational' choice." *Id.* (quoting *United States v. Ornelas–Rodriguez*, 12 F.3d 1339, 1347 (5th Cir. 1994) (citation omitted)). Relevant here, "[a] confession is not rendered involuntary simply because a suspect is advised that 'there are advantages to cooperating.' " *Id.* (quoting *Ornelas–Rodriguez*, 12 F.3d at 1348). In such a situation, an accused's statements are not per se involuntary, because "[i]t is reasonable to assume that the cooperation of an arrested person often is prompted by a desire for leniency for himself or others[.]" *Id.* (quoting *United States v. Robertson*, 582 F.2d 1356, 1368 (5th Cir. 1978)).

Again, Detective Waguespack testified that he did not promise Defendant that no federal charges would be brought if he cooperated, nor did he threaten him with federal prosecution. Instead, according to Detective Waguespack's testimony, he merely explained to Defendant that

> [t]ypically on these cases, if we can wrap them up kind of in a timely manner using our own resources [that is, state, not federal, resources], they typically go to state court. But if we have to call in the secret service to help track down the credit card account holders and things of that nature, many times they like to make it federal because they participate in the investigation.

(Hear. Tr., Doc. 64 at 61: 16–25, 62: 1; *see also id.* at 63: 25, 64: 1–3 (when asked if he "basically" told Defendant, "you can resolve this the state way or the federal way," Waguespack responded "yes"); *see also id.* at 62: 2–4 (Waguespack testifying that the situation he just described was commonly the case when he was working in the Financial Crimes Division).)

26

Based on this Court's review of the video evidence capturing Detective Waguespack's conversation with Defendant and the testimony provided at the hearing, the Court finds that Detective Waguespack's statements do not rise to the level of trickery that renders a confession involuntary. Rather, as the Government points out, Detective Waguespack was informing Defendant "of the *potential* for federal prosecution." (Doc. 37 at 10 (emphasis added).)

That said, even if Detective Waguespack seemingly tricked Defendant by suggesting he would be prosecuted in federal court for failure to cooperate, after which Defendant cooperated and was federally prosecuted anyway, this trickery or deceit did not render Defendant's confession involuntary. Courts require much more oppressive and coercive conduct to render a waiver or confession involuntary. *See Bethely*, 2021 WL 6535945, at *6 (finding that the officer's "false statements to petitioner regarding the physical evidence and the possibility that the petitioner's wife . . . might be arrested fall far short under the totality of the circumstances to establish that his statement was not knowingly and understandingly given."); *see also Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986) (rejecting petitioner's challenge to his confession as involuntary where the detective told petitioner that if he confessed, charges would not be brought against his wife).

In *Soffar v. Cockrell*, the Fifth Circuit considered whether a police officer's purposefully misleading statements about the availability of counsel invalidated the defendant's previous waivers of his *Miranda* rights. 300 F.3d 588, 596 (5th Cir. 2002). The court rejected the defendant's argument that any trickery or deceit by an interrogating officer invalidates a suspect's waiver, explaining that the Supreme Court has since interpreted *Miranda*'s language as showing "that trickery or deceit is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.' " *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)). The *Soffar* court further noted

27

that "courts have found waivers to be voluntary even in cases where officers employed deceitful tactics." *Id.* (first citing *Colorado v. Spring*, 479 U.S. 564, 575 (1987) (holding waiver voluntary despite failure to inform suspect of potential subjects of interrogation); then citing, *inter alia*, *United States v. Tapp*, 812 F.2d 177, 179 (5th Cir. 1987) (holding waiver voluntary even though officers failed to tell defendant he was target of investigation)).

As stated above, the Court finds that Detective Waguespack did not trick or mislead Defendant. However, even if he did mislead Defendant through trickery or deceit by threatening to prosecute him in the absence of cooperation, that trickery was not so substantial that it deprived Defendant of the knowledge he needed to understand the nature of his rights and the consequences of abandoning them. *Id.* Instead, this was simply a situation of law enforcement advising a suspect "that 'there are advantages to cooperating.' " *Bethely*, 2021 WL 6535945, at *4 (citation omitted). Therefore, the *Motion to Suppress* as it relates to Defendant's incriminating statements to Detective Frith and Special Agent Kirby on November 5, 2018, is denied.

## V.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Suppress* (Doc. 35) filed by Defendant Jason Brown is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>July 24, 2023</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**